United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARTIS SPECIALTY INSURANCE COMPANY, *et al.*,

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.
___________________________________/

No. C-13-1527 EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

**(Docket No. 51)**

## I. INTRODUCTION

Pending before the Court is Defendant's motion to dismiss various claims from Plaintiff's first amended complaint. Whittaker Corporation and its insurer Chartis Specialty Insurance Co. bring this suit under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), alleging that Defendant United States is responsible for environmental contamination at a site for which Plaintiffs have been paying the costs of remediation. Both Plaintiffs bring claims under § 107(a) of CERCLA seeking to recover all past, present, and future remediation costs. Chartis additionally brings claims under CERCLA § 112(c) which provides a cause of action for persons who have subrogation rights as a result of paying claimants for the costs of remediation efforts. Defendant seeks to dismiss Chartis' claim under § 107(a), arguing that insurance companies must bring their claims under the section governing subrogation rights. Defendant also seeks to dismiss Chartis' § 112(c) claim, arguing that Plaintiffs have failed to state a cause of action under § 112(c), and that any such claim is time barred in any case. Finally, Defendant argues that Plaintiffs' allegation that the United States is jointly and severally liable must

be dismissed because as another potentially responsible party, Whittaker can recover only a proportional share of remediation costs from the United States.

## II. FACTUAL & PROCEDURAL BACKGROUND

This CERCLA action arises out of environmental clean up efforts at a property located at 2751 San Juan Road in Hollister, California ("the Site"). First Amended Complaint ("FAC") ¶ 2 (Docket No. 42). The Site covers approximately 94 acres, and was operated as a dairy farm until 1957. FAC ¶¶ 13-14. In 1957, the Site was purchased by Holex Company, Inc., who is not a party to this action. FAC ¶ 14. Holex owned the Site from 1957 to 1980, and used it for manufacturing and testing military munitions under contracts with the United States. FAC ¶ 16. In 1980, Plaintiff Whittaker purchased the Site and Holex's ordnance manufacturing business. FAC ¶ 17. Whittaker continued to perform work for the United States, manufacturing and testing a variety of munitions for use in the country's defense, including bombs, demolition materials, cartridge- and propellant-related devices, torpedo components, guided missile warhead/explosive components, space vehicle launchers, rocket ammunition, and the Minuteman II missile. FAC ¶ 17. During Whittaker's ownership of the site from 1980 to 1994, "a substantial percentage" of Whittaker's manufacturing was performed under contract with the United States. FAC ¶ 18.

Whittaker also operated an ordnance manufacturing facility similar to the one at the Site in Santa Clarita, California (the "Bermite Site"). FAC ¶ 19. This site had previously been operated by Bermite Powder Company, who had manufactured and tested munitions for the United States at that location from 1942 until 1967, when Whittaker purchased Bermite. FAC ¶ 20-21. In 1987, Whittaker transferred the work under government munitions contracts from the Bermite Site to the Site that is at issue in this action. FAC ¶ 23. A California federal court has found the United States liable under CERCLA for the release of hazardous substances to the environment at the Bermite Site. FAC ¶ 24.

Plaintiffs make various allegations regarding the United States' involvement in the manufacturing of munitions at the Site. FAC ¶¶ 25-43. Plaintiffs allege that the United States, in its contracts with Whittaker and its predecessors, provided detailed specifications for the manufacturing of munitions, including requiring the use of certain hazardous materials, and requiring certain

procedures for handling and disposing of those materials. *Id.* Though the details of these allegations are not relevant to the analysis on this motion, they form the basis for Plaintiff's contention that the United States was an owner and arranger of the Site within the meaning of CERCLA, and that it is thus liable for the clean up of hazardous materials at the Site. FAC ¶¶ 25-43, 74-81. The United States does not contest its liability on this motion.

On October 3, 1991, the California Department of Health Services notified the California Regional Water Quality Control Board–Central Coast Region (the "Board") that elevated levels of trichloroethylene ("TCE") had been detected in the groundwater underlying the Site. FAC ¶ 45. In response, the Board issued Abatement Order No. 93-88 in August of 1993, requiring Whittaker to prepare and submit technical and monitoring reports in accordance with California Water Code § 13267. In 1997, perchlorate was detected in groundwater samples both on and off the Site. FAC ¶ 47.

In July 1999, a new abatement order required Whittaker to conduct a comprehensive environmental investigation of the Site. FAC ¶ 48. This investigation revealed elevated concentrations of various hazardous materials in the soil and groundwater in and around the site, including perchlorate, TCE, and hexavalent chromium. FAC ¶ 49. Since 1993, more than 20 on- and off-Site investigations and risk assessments have been completed, and more than 140 monitoring wells have been installed. FAC ¶ 50. Pilot remediation tests and interim cleanup actions have been conducted, including soil excavation and an installation of a small groundwater treatment system.[1] *Id.* Pursuant to the most recent Board order, issued on July 31, 2009, an on-Site groundwater containment and treatment system has been initiated to contain groundwater contamination on the Site. FAC ¶ 51. Remediation plans for on-Site source areas and off-Site groundwater contamination are under development. *Id.*

The Board is currently overseeing remediation of soil and groundwater at the Site. FAC ¶ 44. Remediation efforts are aimed at addressing soil and groundwater contamination stemming from historical operations at the Site. *Id.* The Board has approved an interim remediation action plan for

[1] The complaint does not explicitly state who performed these tests and clean up activities, but from context it would appear that it was Plaintiffs and various contractors that they retained.

addressing on-Site contamination, but no final remediation action plan has yet been submitted or approved for either on- or off-Site contamination. FAC ¶ 52. None of the Board's orders has released Whittaker or Chartis from CERCLA liability. FAC ¶ 53.

In 1999, Whittaker purchased a Pollution Legal Liability Select/Cleanup Cost Cap Policy ("the Policy") from American International Specialty Lines Insurance Company, now known as Chartis Specialty Insurance Company. FAC ¶ 53. The Policy has effective dates of July 14, 1999 to July 14, 2019 and provides pollution legal liability coverage, subject to certain self-insured retentions, policy limits, and maintenance deductibles. FAC ¶¶ 53-54. The Site is one of the locations covered by the Policy. FAC ¶ 55. The Policy contains the following subrogation provision:

> **Subrogation** — In the event of any payment under this Policy, the Company shall be subrogated to all the Insured's rights of recovery therefor [sic] against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights including without limitation, assignment of the Insured's rights against any person or organization who caused Pollution Conditions or a Pollution Release on account of which the Company made any payment under this Policy . . . .

FAC ¶ 56. As a result of this clause, Plaintiffs allege that Chartis is contractually subrogated to claims pursuant to which Whittaker is, or may be, entitled to seek recovery of costs from the United States based on the United States' responsibility for owning facilities at the Site and arranging for the disposal or treatment of hazardous materials at the Site. FAC ¶ 57.

To date, Whittaker has incurred millions of dollars of necessary response costs to respond to the environmental contamination at the Site resulting from the release of hazardous materials. FAC ¶ 58. Additionally, Chartis has incurred more than $30 million for claims related to Site payments made directly to remediation contractors. FAC ¶ 59. Chartis made these payments directly to the contractors rather than reimbursing Whittaker after Whittaker paid the contractors. *Id.* Under the Policy, Chartis has exposure for certain future cleanup costs that Whittaker will be obligated to pay. *Id.* These funds expended by Whittaker and Chartis were for actions necessary to prevent damage to the public health or welfare, including removing and remediating hazardous substances; monitoring and evaluating releases or threats of releases of hazardous substances; providing alternative water

supplies; investigating, monitoring, and testing contaminated sites; and planning and implementing response actions. FAC ¶ 60. These actions have taken place under the oversight of the State of California through the Board, in accordance with governing regulations. FAC ¶ 62.

Plaintiffs' complaint brings three causes of action against the United States. First, Whittaker and Chartis bring a claim under § 107(a)(4)(B) of CERCLA, which provides that parties who are liable for hazardous materials clean up under CERCLA shall be liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Plaintiffs argue that the United States is liable for remediation costs as an owner and arranger within the meaning of CERCLA. FAC ¶¶ 74-81. As noted above, the United States does not contest in this motion that it is liable for remediation costs at the Site under CERCLA. Plaintiffs argue that they are entitled to seek the cost of remediation efforts as they are persons who have incurred necessary costs of response. FAC ¶¶ 82-88. Plaintiffs allege that the United States "is strictly, and jointly and severally, liable, or is otherwise liable as provided by applicable law, to Chartis and Whittaker for cost recovery for all necessary costs incurred by Chartis and Whittaker, in the past and in the future, in connection with the Site." FAC ¶ 86. Whittaker brings the § 107 claim directly, and Chartis brings the claim both "on behalf of itself and as Whittaker's contractual subrogee." FAC ¶ 87.

The second cause of action is brought by Chartis alone, and seeks to recover from the United States under § 112(c)(2) of CERCLA. That section provides:

> **Subrogation rights; actions maintainable** . . .
> Any person . . . who pays compensation pursuant to this chapter to any claimant for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of action for such damages and costs of removal that the claimant has under this chapter or any other law.

42 U.S.C. § 9612(c)(2). Plaintiffs allege that Whittaker is a "claimant" within the meaning of CERCLA because it has made a written demand to the United States for payment of response costs in a sum certain. FAC ¶ 94. As discussed below, the United States disputes whether Whittaker is properly considered a claimant under this section and whether it has submitted any timely claim to the United States. The United States does not, however, dispute the complaint's allegation that

Chartis has paid compensation to Whittaker in the form of response costs paid to Whittaker or directly to remediation contractors. FAC ¶ 95. Chartis also alleges that it has paid response costs within the three year period prior to the filling of the instant lawsuit, and that it will continue to pay for future response costs at the Site. FAC ¶ 96.

Plaintiffs also bring a third cause of action for declaratory judgement on liability for future response costs at the Site. FAC ¶¶ 101-03.

## III. DISCUSSION

Under Rule 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. Of Bus. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

### A. CERCLA Background and Statutory Scheme

CERCLA, originally enacted in 1980, is designed "to provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) (citation and quotation omitted). CERCLA has three main goals: "to promote the timely cleanup of hazardous waste sites, ensure that polluters were held responsible for the cleanup efforts, and encourage settlement through specified contribution

United States District Court
For the Northern District of California

protection." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013). To effectuate these goals, the statute "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). The Environmental Protection Agency ("EPA"), to whom the President has delegated his powers under the statute, may clean up contaminated sites itself, and may also compel potentially responsible parties ("PRPs") to engage in clean up efforts, or pay for clean up efforts conducted by the EPA. *Chubb*, 710 F.3d at 956; 42 U.S.C. § 9604(a).

As part of a comprehensive statutory framework, the statute imposes strict liability for the costs of environmental clean up on four categories of potentially responsible parties (PRPs).[2] *United States v. Atl. Research Corp.*, 551 U.S. 128, 131 (2007); 42 U.S.C. § 9607(a)(1)-(4). Anyone who falls within one of the categories of PRPs is liable even if that person did not contribute to the environmental contamination. *Chubb*, 710 F.3d at 957. Liability under CERCLA is generally joint and several, such that a PRP may be held responsible for the entire cost of clean up, even when other parties contributed to the contamination. *Id.* CERCLA provides three mechanisms for the government or private parties to bring suit to compel a PRP to pay remediation costs: "(1)

---

[2] The categories of PRPs are:

> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a)(1)-(4).

cost-recovery actions under section 107(a), (2) contribution actions under section 113(f)(1), and (3) subrogation actions under section 112(c)(2)." *Id.*

For the purposes of the instant motion, there does not appear to be any dispute that both Whittaker and the United States are PRPs. Under the currently operative complaint, both Whittaker and Chartis bring claims for cost recovery under § 107(a), and Chartis brings an additional subrogation claim under § 112(c)(2).

B. <u>Chartis' Claims Under CERCLA § 107(a)</u>

In the first cause of action, Chartis brings claims under § 107(a) "on behalf of itself and as Whittaker's contractual subrogee." FAC ¶ 87. Section 107(a) provides that PRPs are liable for, *inter alia*,

> (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; . . .

42 U.S.C. § 9607(a)(4)(A)-(B). Plaintiffs here seek to recover necessary costs associated with clean up efforts at the Site under § 107(a)(4)(B). As discussed below, the question of whether Chartis may properly bring a claim under § 107(a) turns on the question of when a party can be said to have "incurred" the necessary costs of remediation.

The United States argues that Chartis' claim under § 107(a) must be dismissed because an insurer may only recover sums paid on behalf of its insured only through § 112(c)(2) subrogation claims, and not through § 107(a) claims for cost recovery. Though the United States points to several district court opinions supporting its position, its argument rests primarily on the recent Ninth Circuit decision in *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946 (9th Cir. 2013).[3]

---

[3] At the time of the hearing on this motion, a request for *en banc* review was pending in *Chubb*. The Ninth Circuit has since denied the request. *See* Docket No. 67.

In *Chubb*, an insurance company for the current owner of a contaminated site brought suit against other PRPs under CERCLA sections 107(a) and 112(c). 710 F.3d at 952-53. The insurance company had reimbursed its insured for $2.4 million in expenses in connection with remediation efforts the insured had undertaken at the contaminated site. *Id.* at 953. The court held that the insurance company could not bring suit to recover costs under § 107(a) because it had not itself "incurred" the costs of remediation. *Id.* at 962. The court noted that the statute does not define the term "incur," and thus looked to the ordinary meaning of the term, which the court gave as "'[t]o acquire or come into,' '[t]o become liable or subject to as a result of one's action,' to 'bring upon oneself.'" *Id.* at 961 (quoting Am. Heritage Dictionary (4th ed. 2000)). The court held that

> Applying these definitions, section 107(a) plainly applies to a person who, through his or her own actions, becomes statutorily liable for, or is subject to, the costs related to the cleanup of hazardous substances or the permanent remediation of a release or threatened release of hazardous substances into the environment in a manner consistent with the [national contingency plan]. Here, Chubb only alleges that [its insured] Taube–Koret, by virtue of its ownership of the San Antonio Road properties, became statutorily liable under CERCLA for the response costs related to the cleanup of the contaminated soil on those properties. Chubb does not dispute that the [complaint] lacks any allegation that Chubb, by any independent action of its own or by ownership of Taube–Koret's property, became liable for those response costs under CERCLA. Chubb only alleges that by virtue of reimbursing Taube–Koret under its Policy, it became subrogated to Taube–Koret's right to pursue a section 107(a) claim. But a subrogee – simply by stepping into the shoes of the insured via a reimbursement – cannot be liable for response costs under CERCLA, and thus cannot itself incur response costs.

*Id.* at 961-62. The court thus held that an insurer who had not itself incurred remediation costs was limited to bringing suit under the subrogation provision in § 112(c). *Id.* at 971.

Under this rule, it is clear that the portion of Chartis' § 107(a) claim that is based on subrogated claims (where Chartis is seeking funds that it reimbursed to Whittaker) must be dismissed.[4] Chartis seeks to distinguish *Chubb* in that here Chartis has paid some of the costs of remediation directly to the relevant contractors, rather than simply reimbursing Whittaker for costs Whittaker incurred. *Chubb* did not directly address the question of an insurer who directly pays the

[4] Chartis does not argue to the contrary, but notes that it asserted a claim under § 107(a) as Whittaker's subrogee only to preserve the point for appeal. Chartis' Opp. at 2 n.7.

United States District Court
For the Northern District of California

costs of remediation rather than simply reimbursing its insured, and different parts of the opinion contain contradictory indications regarding whether an insurer who does so would be limited to bringing suit under § 112(c).

The rule articulated in *Chubb*, that § 107(a) is limited to "a person who, through his or her own actions, becomes statutorily liable for, or is subject to, the costs related to the cleanup of hazardous substances" clearly suggests that Chartis may not bring a § 107(a) claim here, as it is not itself statutorily liable as a PRP, but only contractually liable to PRP Whittaker.  This result is consistent with § 107(e)(1), which provides that liability under CERCLA may not be transferred by means of an indemnification agreement.  42 U.S.C. § 9607(e)(1).  The court in *Chubb* noted that it would be "fundamentally unfair" to allow insurance companies "a broad subrogation right under section 107(a) or 112(c)" because insurers "thus would reap the benefits of [their insureds'] rights without remaining liable under CERCLA for any future violation or continuing remediation."  *Id.* at 971.

Similarly, the *Chubb* court's discussion of the relationship between different parts of the statute and the policy reasons in favor of limiting insurers to § 112(c) actions supports the government's position on this motion.  The court expressed concern that "permitting insurers to sue under section 107(a) would render CERCLA's subrogation provision under section 112(c) 'nugatory.'"  *Chubb*, 710 F.3d at 965.  The court noted that the subrogation rights provided under § 112(c) were narrower and subject to certain requirements not applicable to § 107(a) actions, such that if insurers were permitted to bring actions under either provision, they would inevitably bring claims under § 107(a) and render § 112(c), and the limits on subrogation rights associated therewith, meaningless.  *Id.*

On the one hand, this argument would seem to apply with slightly less force in this case: allowing insurers who have paid remediation expenses directly to pursue § 107(a) actions would not render § 112(c) a nullity because insurers who have only reimbursed their insured would still be required to bring their claims under § 112(c).  On the other hand, allowing insurers who pay remediation costs directly to bring suit under § 107(a) would likely undermine the role § 112(c) in

the statutory scheme by allowing insurers to go around the limits in that section simply by paying costs directly.

It is true that there is some language in *Chubb* that suggests that an insurer in Chartis' position might be permitted to bring a § 107(a) claim, largely in connection with the court's discussion distinguishing earlier district court cases. For example, the court distinguishes *Karras v. Teledyne Indus., Inc*., 191 F. Supp. 2d 1162 (S.D. Cal. 2002), where the court had found that the plaintiffs – Trusts who had been carrying out remediation efforts – had incurred costs such that they were able to bring an action for contribution under § 113 of CERCLA. In distinguishing *Karras*, the *Chubb* court stated:

> In *Karras*, the district court held that the plaintiff Trusts incurred response costs necessary to maintain a contribution action under section 113 because it contractually assumed the duty to clean up the polluted site and performed the actual cleanup. *In contrast, Chubb did not engage in any of the remediation activities itself, and the Policy it issued Taube–Koret was not executed for the purpose of cleaning up a polluted site.* Rather, the Policy insures Taube–Koret against the risk of liability and provides for environmental cleanup costs it could potentially incur on its property.

*Chubb*, 710 F.3d at 964 (internal citations omitted) (emphasis added). Based on this language, Chartis argues that the instant case is more like *Karras* than *Chubb* for two reasons: Chartis has directly paid for remediation efforts, and the insurance policies here were executed for the purpose of cleaning up a polluted site. To evaluate this argument, it is necessary to take a closer look at *Karras*, and a similar case from the Seventh Circuit on which Chartis relies, *Bernstein v. Bankert*, 702 F.3d 964 (7th Cir. 2012).

Chartis argues that *Karras* and *Bernstein* recognize that insurance companies who directly pay for clean up costs may bring direct cost actions under § 107(a). Docket No. 53 at 12-14. As an initial matter, neither *Karras* nor *Bernstein* involved insurance companies. The plaintiffs in both were rather trustees of trusts created to fund and perform remediation work at specific sites pursuant to consent orders between PRPs and government agencies. *Bernstein*, 702 F.3d at 970; *Karras*, 191 F. Supp. 2d at 1164. In both cases, the courts found that the trusts had incurred costs within the

meaning of CERCLA and thus permitted them to bring claims.[5] *Bernstein*, 702 F.3d at 978 ("Of course, the Trustees also incurred necessary costs of response consistent with the national contingency plan. They did not simply reimburse the EPA for a removal action it had already performed; they funded and executed the removal action themselves."); *Karras*, 191 F. Supp. 2d at 1170 ("The plaintiffs assumed the duty to perform clean-up pursuant to the Trust Agreements, have performed actual cleanup on the Chatham site and seek an equitable portion of their response costs.").

Chartis' analogy to *Karras* and *Bernstein* is unconvincing because an insurance company who indemnifies a PRP (either through reimbursement or by directly paying remediation costs) is not in the same position as a trust set up by PRPs pursuant to a consent order for the purpose of funding and carrying out remediation efforts at a site. Significantly, the court in *Karras* found that the trusts themselves were "undeniably PRPs." 191 F. Supp. 2d at 1169.

> The Court recognizes that, unlike the grantors, the Trusts elected their PRP status by contract. However, the statute does not foreclose entities from attaining PRP status by contract. Indeed, CERCLA does not preclude voluntary associations from pursuing section 113 contribution action as PRPs. The Court is also cognizant of its duty to liberally interpret CERCLA to advance clean-up efforts. Plaintiffs acknowledge their PRP status in the complaint, which states that plaintiffs "bring this action on behalf of the Grantors" and seeks mere contribution, rather than joint and several cost recovery, as would be available to non-PRP plaintiffs. Thus, the trusts stand in the shoes of PRPs *because they have undertaken the liability for clean-up of the Chatham site*.

*Id.* at 1169-70 (internal citations omitted) (emphasis added). Here, Chartis did not undertake the liability for clean up. Moreover, while it may have paid some of the remediation costs directly, the

///

///

///

[5] The plaintiffs in *Karras* brought claims not under § 107(a) but under § 113, which allows claims for contribution. 191 F.Supp. 2d at 1164. The plaintiffs in *Bernstein* brought claims under both § 107(a) and § 113. 702 F.3d at 971. Though the *Bernstein* court found that the plaintiffs had incurred costs within the meaning of § 107(a), the court ultimately held that the plaintiff's § 107(a) claims should not proceed because their claims should have been brought solely under § 113 for reasons that are not relevant to the analysis here. *Id.* at 980.

complaint does not allege that Chartis has had any significant role in directing remediation efforts beyond writing checks.[6] Chartis is not a PRP like the trust in *Karras*.

*Bernstein* is similarly distinguishable. While that case does not address the question of whether the plaintiff trustees are PRPs, the trust in that case, like in *Karras*, was created as part of a consent agreement between the EPA and various PRPs, and appears to have been the primary entity directing clean up efforts after its creation. *Id.* at 970-71. The court there found that the plaintiffs had incurred costs in remediating contamination because they did not simply reimburse the EPA, but "funded and executed the removal action themselves." 702 F.3d at 978. Chartis' involvement in this case, even if it did directly pay some contractors, is simply not analogous to a trust that is responsible for managing all clean up efforts at a site.

Chartis also relies on the recent Supreme Court case *United States v. Atlantic Research Corporation*, 551 U.S. 128 (2007), arguing that the Court's reading of the phrase "any other person" in § 107(a) clearly indicates that Chartis should be able to bring a claim under that provision. The Court in *Atlantic Research* considered the question of whether PRPs could bring suit against other PRPs under § 107(a), or whether they were limited to bringing actions for contribution under § 113. *Id.* at 131. The Court noted that § 107(a)(4)(B) provided for recovery of "any other necessary costs of response incurred by any other person consistent with the national contingency plan," and held that looking to the plain meaning phrase "any other person," this section clearly "authorizes cost-recovery actions by any private party, including PRPs."[7] *Id.* at 136. Chartis thus argues that under *Atlantic Research*, it should be able to bring a § 107(a) claim because it falls within this literal, expansive understanding of "any other person." The court in *Chubb*, however, considered and rejected this argument. The Ninth Circuit noted that they key term in § 107(a) there, as here, is not "any other person" but "incur." 710 F.3d at 963.

> Chubb argues that the Court's reading of "any other person" under section 107(a) supports its position that insurance companies, too,

---

[6] Chartis' opposition states that it "consulted regarding the remediation," but it is not clear what this entails. Chartis' Opp. at 13.

[7] The Court read the "other"in this phrase to be in reference to entities listed in § 107(a)(4)(A): the United States Government, states, and Indian tribes.

United States District Court
For the Northern District of California

> should be included as a party under that provision. However, the Court's interpretation of "any other person" under 107(a) is limited to "a private party that *has itself incurred cleanup costs*."

*Id.* (citing *Atlantic Research*, 551 U.S. at 139) (emphasis in *Chubb*).[8]

In addition to *Chubb*, the United States cites to several district court opinions that it argues directly address the question of whether an insurer may ever bring suit under § 107(a). Docket No. 54 at 2-3. *California Dep't of Toxic Substances Control v. City of Chico, Cal.*, which the court in *Chubb* cited with approval, rejected an insurance company's attempt to bring a claim under § 107(a). 297 F. Supp. 2d 1227, 1232 (E.D. Cal. 2004). There, the court held:

> Put directly, Century has not incurred any response costs; rather, it has indemnified Noret for Noret's response costs. Its involvement with the Central Plume Site is exclusively in its capacity as Noret's insurer. Century was obligated by the law governing insurance contracts to incur the costs related to the site investigation. Neither CERCLA, nor any other law concerning environmental remediation, determined its obligation to Noret.

*Id.*[9] Though it is not entirely clear from the decision in *City of Chico* whether the insurer paid remediation costs directly or reimbursed its insured, there is some suggestion that it may have paid costs directly. *Id.* (noting that the insurance company argued that "regardless of the source of its obligation to incur costs relating to the site remediation the fact remains that Century, and not Noret, has incurred such costs, and it therefore has the superior right under CERCLA to seek recovery of

---

[8] Chartis also argues that it should not be compelled to bring its claims under § 112(c) for remediation costs it has paid directly because the plain meaning of that section presupposes that the party bringing a § 112(c) claim has reimbursed a PRP. Section 112(c)(2) provides that:

> Any person . . . who pays compensation pursuant to this chapter to any claimant for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of action for such damages and costs of removal that the claimant has under this chapter or any other law.

42 U.S.C. § 9612(c)(2). Chartis' argument on this front is not entirely devoid of merit. Though this section could be read in such a way that an insurer "pays compensation to" its insured when it directly pays contractors whom the insured would otherwise have had to pay for remediation efforts, this arguably stretches the plain meaning of the text. As discussed below, however, in light of *Chubb* and the other cases cited by the parties, this Court finds that *Chubb* is controlling on this issue.

[9] Some of the other rationales the court gives for its ruling are based on cases that have since been overruled by *Atlantic Research*, but this does not affect the court's finding that the insurance company had not "incurred" any costs within the meaning of § 107(a).

those costs.") (internal alterations omitted). Similarly, a court in this District held in *Am. Int'l Specialty Lines Ins. Co. v. United States* ("*AISLIC*"), that "Plaintiff is seeking to recover sums it paid on behalf of its insured; therefore, it may recover under CERCLA only through a subrogation action." C 04-01591 CRB, 2005 WL 680159, *4 (N.D. Cal. Mar. 24, 2005).[10] The decision in *AISLIC* does not expressly discuss whether the insurance company paid remediation costs directly but that is implied as the sums were paid "on behalf of" the insured. *Id.* While these cases do not explicitly address the question of whether an insurer who has made direct remediation payments may bring a claim under § 107(a), they suggest that a broader understanding of the rule articulated in *Chubb* is the more accurate one.[11]

The government's position is also supported by the fact that the doctrine of subrogation does not generally distinguish between an insurer's direct payments on behalf of its insured and reimbursement payments to an insured. The court in *Chubb* contains an initial discussion of subrogation rights generally that suggest that the existence of subrogation rights does not depend on whether the insurer pays an insured's loss directly, or through reimbursement. 710 F.3d at 957 ("As

---

[10] The court in *AISLIC* went on to hold that the insurance company's contribution claim under § 112 should be dismissed as unripe because it had not satisfied the "make-whole rule" which requires an insurance company to make its insured whole before pursing subrogated claims. 2005 WL 680159, *4. Chartis argues that *AISLIC* is no longer good law because the Court of Federal Claims, to which the case was transferred, later found that the parties had contracted around the make-whole rule, and that the insurance company's claims were thus ripe. *Am. Int'l Specialty Lines Ins. Co. v. United States*, 05-1020 C, 2008 WL 1990859 (Fed. Cl. Jan. 31, 2008). The Court of Federal Claims, however, did not address the question of whether the insurance company could bring CERCLA claims under sections other than § 112, so to the degree that it overruled the district court's decision, it did not do so with respect to the holding that is relevant to the analysis of § 107(a).

[11] After the hearing in this case, the United States submitted a notice of recent decision in *Appleton Papers Inc. v. George A. Whiting Paper Co.*, Case No. 08-C-16 (E.D. Wis. June 25, 2013). Docket No. 60. This case, which cites *Chubb*, rejected the argument that a party that was only contractually liable for clean up costs could bring a claim under § 107(a), even though that party had paid response costs directly. Plaintiffs object to this submission as impermissible under Local Rule 7-3(d), which provides that parties may submit notices of recent decisions "*[b]efore* the noticed hearing date." Local Rule 7-3(d)(2). While the holding in *Appleton Papers* does seem to provide some support for this Court's conclusion that Chartis may not bring a claim under § 107(a), it also appears distinguishable in that the court in that case had previously found that the entity the plaintiff was indemnifying was not entitled to pursue a claim under § 107(a) for reasons that are not entirely clear in the order. In any case, this Court finds that nothing in *Appleton Papers* changes the analysis in this section, and thus does not rely on this case in reaching its conclusion. Plaintiffs' objection about the propriety of the submission is thus overruled as moot.

United States District Court
For the Northern District of California

the party who pays the insured's loss, the insurer (the subrogee) 'stands in the shoes' of the insured (the subrogor), and succeeds to the insured's rights and remedies."). Though *Chubb* ultimately found that the statutory subrogation provision in CERCLA displaces common law subrogation, the fact that the doctrine of subrogation historically has not distinguished between direct and reimbursement payments by insurers provides some support for the government's position.

Accordingly, the Ninth Circuit's discussion of subrogation rights in *In re Hamada* is instructive on the issue of subrogation rights generally:

> In general terms, subrogation is the substitution of one party in place of another with reference to a lawful claim, demand or right. It is a derivative right, *acquired by satisfaction of the loss or claim that a third party has against another*. Subrogation places the party paying the loss or claim (the "subrogee") in the shoes of the person who suffered the loss ("the subrogor"). Thus, when the doctrine of subrogation applies, the subrogee succeeds to the legal rights and claims of the subrogor with respect to the loss or claim.
>
> There are various types of subrogation, most commonly categorized as "conventional" or "contractual" subrogation, "legal" or "equitable" subrogation, and statutory subrogation. "Conventional" or "contractual" subrogation rights arise from an express or implied agreement between the subrogor and subrogee. "Equitable subrogation is a legal fiction, which permits a party *who satisfies another's obligation* to recover from the party 'primarily liable' for the extinguished obligation." The right of "legal" or "equitable" subrogation arose as a "creature of equity" and "is enforced solely for the purpose of accomplishing the ends of substantial justice." Statutory subrogation, as one might expect, occurs by virtue of a right created by statute.

291 F.3d 645, 649 (9th Cir. 2002) (emphasis added) (internal citations omitted).

Finally, the subrogation clause in the insurance policy between Whittaker and Chartis is broadly written and comports with the common law understanding of subrogation rights. The Policy contains the following subrogation provision:

> **Subrogation –** In the event of any payment under this Policy, the Company shall be subrogated to all the Insured's rights of recovery therefor [sic] against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights including without limitation, assignment of the Insured's rights against any person or organization who caused Pollution Conditions or a Pollution Release on account of which the Company made any payment under this Policy . . . .

FAC ¶ 56.  This clause gives Chartis subrogation rights for "any payment under this Policy," and does not distinguish between payments to the insured and payments to third parties to satisfy the insured's obligations.

Having considered the cases cited by the parties, the Court finds Plaintiff's attempts to distinguish *Chubb* unpersuasive, and finds that its holding applies here.  Though the decision in *Chubb* has some language suggesting that the rule it articulates is dependant on the fact that the insurer in that case had merely reimbursed the insured, the court's core holding is that an insurer has not "incurred" costs within the meaning of § 107(a) because it is not liable under CERCLA for remediation costs.  Under this rule, the holding in *Chubb* applies with equal force to insurers who pay costs directly.  Further, the general understanding of subrogation rights does not appear to distinguish between direct payments to third parties and payments to reimburse an insured, and this Court can see no reason why such a distinction should be read into the treatment of subrogation rights under CERCLA.

This Court accordingly **GRANTS** Defendant's motion to dismiss Chartis' § 107(a) claims.

C.     Chartis' Claims Under CERCLA § 112

In addition to its direct and subrogated claims under § 107(a), Chartis brings claims pursuant to its subrogation rights under § 112(c).  That provision provides:

> Any person . . . who pays compensation pursuant to this chapter to any claimant for damages or costs resulting from a release of a hazardous substance shall be subrogated to all rights, claims, and causes of action for such damages and costs of removal that the claimant has under this chapter or any other law.

42 U.S.C. § 9612(c)(2).  Claims under § 112(c) are subject to a different limitations period than claims under § 107(a).  42 U.S.C. § 9613(g) (three year limitations period for claims based on subrogated rights).  The United States argues that Chartis' § 112(c) claim must be dismissed because Whittaker is not a "claimant" within the meaning of that section, and because this claim is barred by the statute of limitations.

///

///

///

United States District Court
For the Northern District of California

1. Failure to State a Claim

The United States argues that Chartis has failed to state a claim under § 112(c) because it has failed to sufficiently allege that Whittaker is a "claimant" within the meaning of that section. The United States relies entirely on *Chubb* in support of its argument.

As the court in *Chubb* noted, CERCLA defines "claimant" as "any person who presents a claim for compensation under this chapter," and "claim" as "a demand in writing for a sum certain." 42 U.S.C. § 9601(4)-(5). Though this definition does not specify to whom a claim must be made, the court in *Chubb*, looking to the statutory scheme and Ninth Circuit precedent, held that "a claimant is a person who demands reimbursement of environmental cleanup costs from (i) the Superfund or (ii) a potentially liable party." 710 F.3d at 959. As there was no allegation that the insured in *Chubb* had made any demand on the defendants, the court found that the insured was not a "claimant" within the meaning of § 112(c), and that the insurance company thus could not bring a subrogation suit under that provision.

Chartis contends that in this case, Whittaker has made two claims against the United States within the meaning of the statute: one in the form of its original complaint, which was filed on December 10, 2012 and did not include a § 112(c) claim, and the other in a March 28, 2013 letter from Whittaker to the United States. Chartis' Opp. at 15-16. The fundamental dispute between the parties is whether *Chubb* requires that Whittaker have already submitted a claim to the United States before the time that Chartis made payments to or on behalf of Whittaker for the remediation.

The United States' position – that Whittaker must have submitted the claim prior to any payments made by Chartis – finds some support in the text of § 112(c). That section provides subrogation rights to any person "who pays compensation pursuant to this chapter to any claimant." 42 U.S.C. § 112(c)(2). This language could be read to require that the party receiving payment be a "claimant" at the time payment is received.

While the court in *Chubb* had no occasion to consider the timing of any claim requirement because the insured in that case had made no claim at any point, the court's discussion of the policy rationale for the rule:

> Requiring PRPs to *first seek claims from the Superfund or other PRPs, instead of resorting to insurance money*, ensures that PRPs are identified and held accountable for cleanups. PRPs are in a better position to locate and identify other PRPs because they are more knowledgeable about the polluting site and engage in the cleanups themselves, rather than insurance companies who are detached from the property and are not involved in the remediation activities. This furthers CERCLA's goal of making polluters pay for cleanup costs. Making polluters pay, in turn, frees up, not reduces, the available insurance money for remediation. Additionally, requiring the insured to pursue a claim before a subrogation right vests under section 112(c) would not be unduly burdensome or have a slowing effect on cleanups of polluted sites. Insurance companies may write their policies in a way as to require reasonable cooperation from their insureds. In the Policy at issue, for example, Taube–Koret already had a duty "to cooperate and otherwise offer [Chubb] reasonable assistance in the defense, investigation or settlement of a claim."

710 F.3d at 970 (emphasis added). Arguably, the policy concerns *Chubb* highlights suggest it would be preferable for an insured to first make a demand of other PRPs before seeking compensation from insurance. On the other hand, in the next paragraph, *Chubb* notes that "requiring the insured to *make a claim before an insurer can pursue a section 112(c) claim* does not give a "free pass" to actual polluters." *Id.* (emphasis added). This phrasing suggests that the insured need only make a claim prior to the insurer pursuing a § 112(c) action, not prior to receiving any payment from the insurer.

In light of the policy concerns behind CERCLA, the Court finds the government's reading of § 112 overly harsh and not compelled by the holding in *Chubb*. If this Court were to adopt the government's proposed rule and require a PRP expending funds for clean up efforts to submit a claim to other PRPs prior to any payments by the insurance company, subrogation claims could forever be barred as to funds expended by insurance companies before their insureds submitted claims to other PRPs. This would incentivize insurance companies to delay expending funds until they could be sure that the insured had submitted claims to all other PRPs. Such a delay could be significant, especially where the identity of the other PRPs is not initially known. Such a rule could have the effect of delaying the flow of money for clean up efforts, and thus delay clean up of contaminated sites for a significant period of time. It would also allow PRPs to escape liability for their full share of costs where their identities were discovered after clean up efforts were underway and related insurance payments had been made. Such a result is not required by either the text of §

112(c) or the holding in *Chubb* and would be contrary to CERCLA's goal of promoting the timely clean up of hazardous waste sites. Furthermore, requiring a claim be made before an insurer can bring a § 112(c) action would still encourage prompt action by PRPs against other PRPs.

This Court thus finds that Whittaker is a "claimant" within the meaning of § 112(c) because it submitted a claim to the United States requesting contribution prior to Chartis' assertion of § 112(c) claims in the instant suit.

2. <u>Statute of Limitations</u>

The United States argues that in any case, Chartis' claims are barred by the statute of limitations. Under CERCLA, "[n]o action based on rights subrogated pursuant to this section by reason of payment of a claim may be commenced under this subchapter more than 3 years after the date of payment of such claim." 42 U.S.C. § 9613(g)(4) (§ 113(g)(4)). The amended complaint alleges that Chartis has incurred at least some response costs within the last three years (and that it will continue to incur costs), it is not clear how much of these costs are inside the three year window. FAC ¶ 96. The parties dispute when the limitations period begins to run. In their briefs and at the hearing, the parties discussed five different possibilities: (1) when the claim has been fully paid; (2) when the insured makes a claim to the defendant; (3) each time the insurer makes a payment; (4) when the insurer makes its first payment on the claim; or (5) when the insurer becomes liable for the payment. *See* Mot. at 13-15; Reply at 7-9. Chartis argues that the statute begins to run either from the date the claim is fully paid, or, in the alternative, from the date of each payment made by the insurer. Few cases cite to this section of CERCLA, and none squarely addresses the question of when the limitations period begins to run.

The government points to *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc*. ("*Chubb II*"), in which the court dismissed the insurer's § 112(c) claims with leave to amend because the complaint failed to allege when the insured made its claims or when the insurer paid the claims. C 09-4485 JF (PVT), 2010 WL 2573386, *6-7 (N.D. Cal. June 23, 2010). If anything, however, this case undermines the government's argument that the statute of limitations begins to run when the insurer becomes liable for payments, as the court notes that "if [the insurer] *paid* [the insured's] claims before September 23, 2006, the subrogation claim is time-barred." *Id.* at *6. This case is not

helpful, however, in parsing between the remaining alternative readings of § 113(g)(4), however, as the insurer in that case appears to have made one lump sum payment to its insured. *Id.* at *2, *6; *Chubb*, 710 F.3d at 955. The court thus had no occasion to consider in a case involving multiple payments whether the statute begins to run at the date of first payment, the date of last payment, or from the date of each payment separately made, as there was only one date of payment in that case.

The government's argument that the limitations period begins to run from the date that the insurer becomes liable for the costs is not consistent with the plain language of § 113(g)(4), which states that no action may be brought "more than 3 years after *the date of payment of such claim*." The cases the government cites for the argument that "a cause of action usually accrues and the statute of limitations commences to run when the wrongful act or omission results in damages," do not arise under CERCLA, nor do they concern insurers seeking to recover from third parties for payments made on behalf of their insureds. *Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004) (causes of action under § 1983 accrue when the plaintiff knows or has reason to know of the injury that is the basis of the action); *Delaware State Coll. v. Ricks*, 449 U.S. 250, 257 (1980) (statute of limitations on Title VII claim begins to run when professor is denied tenure, not at the end of short term contract following the denial); *Louisiana-Pac. Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1580-81 (9th Cir. 1994) (discussing Washington law on statute of limitations governing products liability actions).

Chartis also argues that a rule that the statute of limitations begins to run when the insurer makes its first payment on a claim is in tension with the "make whole rule," and puts insurers who pay claims over a long period of time at risk of being shut out of court. For example, in *City of Chico*, the court dismissed the insurance company's § 112(c) claims as unripe because the insurance company had not yet fully compensated its insured for remediation costs. 297 F. Supp. 2d at 1236-37. The court noted that "[f]ederal common law requires that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated, that is, has been made whole." *Id.* at 1236. Though parties may contract around this rule, *see Barnes v. Indep. Auto. Dealers Ass'n of California Health & Welfare Benefit Plan*, 64 F.3d 1389, 1394 (9th Cir. 1995), and it is not at issue in this case, the make whole rule weighs against

interpreting the limitations period in § 113(g)(4) to run from the initial payment made by the insurance company. Such an interpretation, requiring an insurer to bring suit within three years of making the first payment on a claim, would shut insurers out of court where they were making payments on a complex, multi-year claim and had not contracted around the make whole rule. It also would encourage the filing of early and multiple suits to collect on a series of payments, not an unlikely event since clean up efforts often take years.

On the other hand, Chartis points to a number of cases interpreting limitations periods in cases involving ongoing payments made in the course of long-term remediation efforts. Though none of them analyze the limitations period under CERCLA, they hold that the statute of limitations on an insurer's cause of action runs anew from each payment it makes to its insured. *Sherwin-Williams Co. v. ARTRA Grp., Inc.*, 125 F. Supp. 2d 739, 757 (D. Md. 2001) (under Maryland law, statute of limitations for contract indemnification ran separately for each payment the insurance company made in the course of multi-year clean up of contaminated property); *State Of New York v. Speonk Fuel, Inc.*, 307 A.D.2d 59, 61, 762 N.Y.S.2d 674, 676 (2003) (rejecting arguments that statute of limitations began to run on cause of action for common law indemnity either at the time of the first payment, or at the time of the last payment, and holding that a cause of action accrues "each time the Fund makes a payment for cleanup and removal costs" and that the plaintiff could thus recover only for payments made within the limitations period) *aff'd sub nom. State v. Speonk Fuel Inc.*, 3 N.Y.3d 720, 819 N.E.2d 991 (2004); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, MASTER FILE1:00-1898, 2007 WL 1601491 (S.D.N.Y. June 4, 2007) ("Each payment of remediation costs for which a petroleum discharger is responsible incurs a new loss for a plaintiff, creating a new indemnity claim with its own new statute of limitations (it does not, however, reset the clock on an already-expired indemnity claim)."), *reconsideration granted on other grounds sub nom. In re Methyl Tertiary Butyl Ether ("MTBE'') Products Liab. Litig.*, 1:00-1989, 2007 WL 2936214 (S.D.N.Y. Oct. 4, 2007); *Soo Line R. Co. v. Tang Indus., Inc.*, 998 F. Supp. 889, 898 (N.D. Ill. 1998) (statute of limitations under Illinois Joint Contribution Tortfeaser act barred recovery of payments made prior to two year limitations period, but not of payments made within two year period). The government correctly points out that each of these

United States District Court
For the Northern District of California

cases relies on provisions of law that are inapplicable here. Nonetheless, together they suggest that in cases involving multiple payments made over the course of long-term remediation efforts, courts often find that each payment gives rise to its own cause of action, and that the limitations period thus runs from each separate payment for that payment, rather than from either the first or last payment made. Such a rule would be entirely consistent with the text of § 113(g)(4) which states that no action shall commence "more than 3 years after the date of payment of such claim."

For the first time at the hearing, Chartis suggested that consistent with the interpretation of § 112(c) discussed above, the statute of limitations should be interpreted to run beginning at the date that the insured makes a claim against other PRPs (rather than when the insurer makes payment). As the insurer's subrogation rights under § 112(c) do not vest until such a claim has been made, a contrary rule would present the danger of claims being barred by the statute of limitations before the insurer's right to bring them even vests. Where an insurer makes payments more than three years before its insured makes a claim to the other PRP, for example, the initial payments would be barred by the statute of limitations even though the insurance company could not have brought suit under § 112(c) prior to the date its insured made the claim. However, a construction of § 113(g)(4) which provides that the limitations period accrues upon the insurer's payment, together with the requirement under § 112(c) that claims first be made against other PRPs, would have the salutory effect of encouraging the prompt presentation of claims to other PRPs and prevents stale subrogation claims by insurers.

Accordingly, this Court finds that the statute of limitations on Chartis' § 112(c) claims runs separately for each payment made in the course of remediation efforts. Since Chartis alleges that it has made some such payments within the last three years, its claims are not entirely barred by the statute of limitations. The United States' motion, however, is **GRANTED** as to all payments made by Chartis more than three years prior to April 23, 2013, the date Chartis filed its amended

///

///

///

///

United States District Court
For the Northern District of California

complaint and asserted § 112(c) claims for the first time. The government's motion to dismiss Chartis' § 112(c) claim is otherwise **DENIED.**[12]

D. Claims for Joint and Several Liability

In the complaint, Plaintiffs allege that the United States "is strictly, and jointly and severally, liable, or is otherwise liable as provided by applicable law, to Chartis and Whittaker" under § 107(a).[13] FAC ¶ 86. The United States moves to dismiss Plaintiffs' request to hold the United States jointly and severally liable, arguing that as a PRP, Whittaker can only recover contribution in proportion to fault. The United States further argues that as Whittaker's insurer, Chartis is entitled to rights no greater than Whittaker's, and that it thus is also barred from seeking to recover from the United States anything more than costs in excess of Whittaker's proportional share.

1. Propriety of 12(b)(6) Motion

As an initial matter, Plaintiffs dispute whether a Rule 12(b)(6) motion to dismiss is the appropriate vehicle for the United States' request, as the unavailability of joint and several liability would not mean that Plaintiffs had failed to state a claim for relief under § 107(a). Plaintiffs argue that Rule 12(b)(6) is "available to dismiss *claims*, not *allegations*," and that the government's motion to dismiss allegations of joint and several liability should be denied. Whittaker Opp. at 3 (emphasis in original). Plaintiffs cite no case holding that Rule 12(b)(6) is not available to dismiss allegations that a defendant is jointly and severally liable, nor do they make any argument about what the proper procedural vehicle for such a request would be.

The United States points to *Whittlestone, Inc. v. Handi-Craft Co.*, in which the court held that Rule 12(f) "does not authorize a district court to strike a claim for damages on the ground that such damages are precluded as a matter of law." 618 F.3d 970, 971 (9th Cir. 2010). In that case, the

---

[12] In its motion, the United States argues that to the degree that Chartis' claims under § 107(a) and § 112(c) are completely dismissed, Chartis' claim for declaratory relief must also be dismissed. Chartis does not dispute this point. *See City of Chico*, 297 F. Supp. 2d at 1236 n.10 (dismissing claim for declaratory relief when the plaintiff's other CERCLA claims were dismissed). As this Court is denying the government's motion as to some of Chartis' claims, however, the motion to dismiss Chartis' claim for declaratory relief is likewise **DENIED.**

[13] The complaint does not mention joint and several liability under Chartis' § 112(c) claim. FAC ¶¶ 90-100.

district court had dismissed the plaintiff's claims for lost profits and consequential damages under Rule 12(f) because it found that the contract between the parties clearly excluded recovery of such damages. *Id.* at 973. As the request to strike damages did not fall within one of the categories of material that may be struck under Rule 12(f),[14] the court found that the defendant's "12(f) motion was really an attempt to have certain portions of Whittlestone's complaint dismissed or to obtain summary judgment against Whittlestone as to those portions of the suit-actions better suited for a Rule 12(b)(6) motion or a Rule 56 motion, not a Rule 12(f) motion." *Id.* at 974.

Citing *Whittlestone*, the court in *Davis v. Capitol Records*, dismissed a request for punitive damages under Rule 12(b)(6) when such damages were not available in connection with the claims the plaintiff was bringing. LLC, 12-CV-1602 YGR, 2013 WL 1701746, *7 (N.D. Cal. Apr. 18, 2013). The Court noted that the "Ninth Circuit has made plain that a court cannot strike certain damages under Rule 12(f) based upon an argument that they are precluded by law, but has endorsed dismissing them under Rule 12(b)(6) when appropriate." *Id.* at *7 n.3. While this Court could find no case applying *Whittlestone* to dismiss a request for joint and several liability, the rationale in that case clearly indicates that such a request is proper under Rule 12(b)(6).

2. Availability of Joint and Several Liability

The parties dispute whether, in the wake *Atlantic Research*'s holding that PRPs may pursue claims against other PRPs under § 107(a), a PRP bringing such a claim may still seek to impose joint and several liability as is generally permitted under § 107(a). The United States argues that *Atlantic Research* does not disturb the prior rule that PRPs may seek only contribution from other PRPs, regardless of the fact that they may now do so under § 107(a) as well as § 113. Plaintiffs argue that *Atlantic Research* declined to limit a PRP bringing suit under § 107(a) to seeking several damages limited to the amount in excess of that PRP's proportionate share of costs, and that *Atlantic Research* identified the procedural mechanism for addressing concerns about the fair apportionment of costs.

[14] Rule 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

United States District Court

For the Northern District of California

Prior to *Atlantic Research*, a number of circuits, including the Ninth Circuit, had held that a PRP bringing suit against another PRP could only seek contribution under § 113, and could not bring a claim for full recovery of costs under § 107(a).  *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 169 (2004) (collecting cases); *Pinal Creek Grp. v. Newmont Min. Corp.*, 118 F.3d 1298, 1301-06 (9th Cir. 1997).[15]  The Ninth Circuit, while it did not prohibit PRPs from bringing suit under § 107(a), held that in suits brought by PRPs, § 107(a) had to be read together with § 113, which provides for actions for contribution between PRPs:

> Because a claim asserted by a PRP under § 107 requires the application of § 113, a PRP is limited to a contribution claim governed by the joint operation of §§ 107 and 113. Therefore, we hold that, under CERCLA, a PRP does not have a claim for the recovery of the totality of its cleanup costs against other PRPs, and a PRP cannot assert a claim against other PRPs for joint and several liability.

*Pinal Creek*, 118 F.3d at 1306.  Courts holding that § 107(a) was unavailable to PRPs, or limiting its scope, expressed concern that PRPs bringing suit against other PRPs could use § 107(a) to evade the shorter statute of limitations and equitable apportionment of § 113 actions.  *See Atlantic Research*, 551 U.S. at 137-38 (recognizing such concerns).

As discussed above, however, *Atlantic Research* held that PRPs could bring suit against other PRPs under § 107(a).  *Id.* at 141.  The Court explicitly addressed concerns that allowing such actions would allow PRPs to skirt the equitable apportionment provisions in § 113.  *Id.* at 140-41.  The Court assumed, without so holding, that § 107(a) provides for joint and several liability.  *Id.* at 140 n.7.  The Court nevertheless rejected arguments that it was inequitable to allow PRPs to pursue § 107(a) actions.  *Id.* at 140.  Noting that § 107(a) and § 113 still applied under different circumstances and that PRPs would thus often not have a choice between the two, the Court held that:

> For similar reasons, a PRP could not avoid § 113(f)'s equitable distribution of reimbursement costs among PRPs by instead choosing to impose joint and several liability on another PRP in an action under § 107(a).  The choice of remedies simply does not exist.  In any event,

---

[15] Some circuits, however, reconsidered this position prior to *Atlantic Research* when the Supreme Court limited § 113 actions in *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 169 (2004).  *See Atlantic Research*, 551 U.S. at 133-34.

> a defendant PRP in such a § 107(a) suit could blunt any inequitable distribution of costs by filing a § 113(f) counterclaim. 459 F.3d, at 835; *see also Consolidated Edison*, *supra*, at 100, n. 9 (collecting cases). Resolution of a § 113(f) counterclaim would necessitate the equitable apportionment of costs among the liable parties, including the PRP that filed the § 107(a) action. 42 U.S.C. § 9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate").

*Id.* Plaintiffs argue that such a § 113 counterclaim is the proper vehicle for ensuring equitable distribution, not dismissing their request for joint and several liability. Whittaker Opp. at 5 ("Further, because other avenues are available to a Defendant to 'blunt any inequitable distribution of costs,' the current state of the law is that such a claim remains permissible, while procedurally it may never come to bear.").

This reading of *Atlantic Research* is supported by the Ninth Circuit's decision in *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924 (9th Cir. 2008). In that case, the plaintiff had brought claims for cost recovery under § 107(a) and for contribution under § 113(f). The court recognized that *Atlantic Research* had overruled the Ninth Circuit's decision in *Pinal Creek:*

> In *Atlantic Research*, the Supreme Court held that § 107(a) provides "so-called potentially responsible parties (PRPs) . . . with a cause of action to recover costs from other PRPs," *id.* at 2334, whereas § 113 provides an action for contribution. In so holding, the Court undermined *Pinal Creek's* holding that § 107 entitles PRPs to seek only contribution, not cost recovery, from other PRPs. To the extent, therefore, that *Pinal Creek* conflicts with *Atlantic Research*, we conclude that *Pinal Creek* has been overruled.

*Id.* at 926-27. The court found that

> Under *Atlantic Research*, a PRP . . . that incurs costs voluntarily, without having been subject to an action under § 106 or § 107, may bring a suit for recovery of its costs under § 107(a); a party in such a position does not need a right to implied contribution under § 107. Any of the defendants sued by such a PRP may seek contribution under § 113(f) because they now will have been subject to an action under § 107.

*Id.* at 933. Though no party in *Kotrous* appears to have made the argument that PRPs bringing suit under § 107(a) are precluded from seeking to impose joint and several liability, this argument is clearly precluded by the court's holding.

The United States points to a *City of Chico*, which noted that PRPs were limited to recovering contribution from other PRPs. 297 F. Supp. 2d at 1234. This case, however, pre-dates *Atlantic Research* and assumes, contrary to the Court's holding in that case, that an insured PRP cannot bring a claim for cost recovery under § 107(a). *Id.* (citing *Pinal Creek*, 118 F.3d 1298).[16] The United States cites also *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 617 (2009). That case, however, did not deal with a suit brought by one PRP against another, but by a suit by the EPA against several PRPs to recover remediation costs the agency had incurred. *Id.* In that case, the Court considered whether the evidence presented to the district court was sufficient to apportion liability between the PRPs rather than holding them jointly and severally liable, and found that it was. *Id.* The case is thus unhelpful in assessing whether one PRP may seek to hold another jointly and severally liable.

The United States objects that requiring it to bring a counterclaim under § 113(f) is unfair because it allows Plaintiffs to shift the burden of proving apportionment of blame to the defendant. While the government may be disadvantaged by such burden shifting, such a scenario was explicitly contemplated by the courts in *Atlantic Research* and *Kotrous*.[17] The United States also expresses concern that this scheme will be unavailing against Chartis, because Chartis will argue that it is an innocent party not subject to a § 113 action. As this Court is dismissing Chartis' claims under § 107(a), however, this argument is moot.

As the holdings in *Atlantic Research* and *Kotrous* indicate that PRPs may bring claims seeking to impose joint and several liability under other PRPs under § 107(a), this Court **DENIES** the government's motion to dismiss Plaintiff's request for joint and several liability. This does not, of course, prevent the United States from bringing a counterclaim for contribution under § 113(f).

---

[16] Though the United States points to two district courts that have followed *City of Chico* in this District, those cases do not discuss the holding that PRPs are limited to recovering in contribution and may not impose joint and several liability. *AISLIC*, 2005 WL 680159, at *3-4; *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 788 F. Supp. 2d 1017, 1023 (N.D. Cal. 2011) *aff'd*, 710 F.3d 946 (9th Cir. 2013).

[17] The parties also dispute whether Whittaker has taken an inconsistent position in another case about the availability of joint and several liability in actions by PRPs under § 107(a), and attach filings from that case in support of their position. Since neither party explains, however, why this would be relevant to the instant motion, this Court disregards these arguments and submissions.

United States District Court
For the Northern District of California

## IV. CONCLUSION

For the foregoing reasons the United States' motion to dismiss is **GRANTED** as to Chartis' § 107(a) claim, and as to the portion of the § 112(c) claim that is based on payments made by Chartis more than three years prior to April 23, 2013. The motion to dismiss is otherwise **DENIED**.

This order disposes of Docket No. 51.

IT IS SO ORDERED.

Dated: July 19, 2013

EDWARD M. CHEN
United States District Judge